**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| THE VLADIMIR GUSINSKY REVOCABLE TRUST, derivatively on behalf of CUMMINS, INC., | Case No. 1:24-cv-128 |
| Plaintiff, | SHAREHOLDER DERIVATIVE COMPLAINT |
| v. | |
| JENNIFER RUMSEY, NORMAN T. LINEBARGER, GARY L. BELSKE; ROBERT J. BERNHARD, BRUNO V. DI LEO, STEPHEN B. DOBBS, DANIEL W. FISHER, CARLA A. HARRIS, THOMAS J. LYNCH, WILLIAM I. MILLER, GEORGIA R. NELSON, KIMBERLY A. NELSON, ALEXIS M. HERMAN, and KAREN H. QUINTOS, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| CUMMINS, INC., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1.      Plaintiff the Vladimir Gusinsky Revocable Trust, ("Plaintiff"), by and through its attorneys, hereby submits this Verified Shareholder Derivative Complaint for the benefit of Nominal Defendant Cummins, Inc. ("Cummins" or the "Company"), against certain current and former officers and directors of Cummins, seeking to remedy breaches of fiduciary duties and unjust enrichment.   Plaintiff makes these allegations upon personal knowledge and the investigation of counsel, which included, among other things, review and analysis of: a) public filings made by Cummins and other related parties and non-parties with the Securities and Exchange Commission ("SEC"); b) press releases and other publications disseminated by certain

1

of the defendants and other related non-parties; c) news articles, shareholder communications and postings on Cummins's website concerning the Company's public statements; d) publicly available filings; and e) other publicly available information concerning Cummins and the defendants. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

2.      Cummins is a U.S.-based multinational company that designs, manufactures, and distributes engines, filtration and power generation products. The Company also services engines and related equipment, such as fuel systems, controls, air handling, filtration, emission control, electrical power generation systems, and trucks.

3.      State and federal governmental agencies heavily regulate engine manufacturers like Cummins because of their significant effect (potentially positive or negative) on the environment, among other things. Cummins long has touted its commitment to environmental responsibility and regulatory compliance as well as its financial reporting transparency.

4.       Unfortunately, Cummins failed to live up to these and other of its commitments and public statements, repeatedly violating federal and state environmental laws causing untold harm to the environment while generating revenue that, inevitably, would be lost to penalties, fines and related reputational and financial costs.

5.      With each violation—once eventually disclosed—came Company reassurances that all compliance problems had been addressed and government regulators satisfied, leaving nothing but business as usual ahead.

6.       As the market would learn, Cummins's version of business as usual includes violating cardinal industry regulations including the Clean Air Act, 42 U.S.C. 85, *et seq*. ("CAA")

and California's Clean Air Act ("CCAA").  These violations occurred and continued with Defendants' knowledge or reckless disregard.

7.      Rather than become the compliant company it should be, Adobe executed a scheme to bypass critical environmental regulations by issuing half-truths and outright misinformation concerning the Company's compliance with federal and state environmental regulations, as more fully alleged below.  These actions (and Board inactions) lulled investors into a false sense of security for years.

8.      On December 22, 2023, Cummins and the U.S. Department of Justice ("DOJ")) announced that the Company had agreed to pay ***$1.67 billion*** to settle DOJ allegations that, between 2013 and 2023, the Company had violated—if not completely disregarded—the CAA and CCAA by installing emission test-cheating "defeat devices" on at least one million engines that otherwise would have not met regulatory standards for sale and use in the U.S.  U.S. Attorney General Merrick Garland described Cummins's fine as ***"the largest civil penalty [the DOJ has] ever secured under the Clean Air Act, and the second largest environmental penalty ever secured."***[1]

9.      Reacting to this news, Cummins's stock price fell $7.01 per share—over 3%—to close at $236.99 on December 22, 2023.

10.     This is not the first time Cummins has settled allegations related to its non-compliance with environmental laws.  Since at least 1998, the Company repeatedly has ignored

---

[1] Press Release: Attorney General Merrick Garland Statement on the Agreement in Principle with Cummins to Settle Alleged Installation of Illegal Defeat Devices in Engines (Dec. 22, 2023) https://www.justice.gov/opa/pr/statement-attorney-general-merrick-garland-agreement-principle-cummins-settle-alleged.  All bold/italic emphasis contained in this Complaint is added.

environmental regulations and made and broken agreements with government agencies when caught, all the while lying to the market about the true state of its regulatory and financial affairs.

11.     Defendants' role in Cummins's untoward business practices, including their wrongful acts and omissions, and the subsequent declines in the market value of Cummins securities, have caused the Company significant losses and damages.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

13.     This Court has jurisdiction over each Defendant because each resides in this district or has sufficient minimum contacts with this district to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. The Court has personal jurisdiction over the Nominal Defendant because it is authorized to do business in this state, has consented to service in this state and its principal place of business is within this district.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because one or more of the Defendants either resides in or maintains offices in this district, a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to Cummins occurred in this district, and Defendants have received substantial compensation in this district by doing business here and engaging in numerous activities that had an effect in this district.

## PARTIES

15.     Plaintiff is a current shareholder of Cummins and has continuously held Cummins common stock since July 11, 2000.  Plaintiff is a citizen of Illinois.

16.     Nominal party Cummins is an Indiana corporation that maintains its principal executive offices at 500 Jackson Street, Columbus, Indiana.

17.     Defendant Jennifer Rumsey ("Rumsey") has served as Cummins's Board Chair and CEO since 2022.  Upon information and belief, Rumsey is a citizen of Indiana.

18.     Defendant Gary L. Belske ("Belske") has served as a Cummins director since 2022. Belske chairs the Board's Audit Committee and is a member of the Governance Committee.  Upon information and belief, Belske is a citizen of Texas.

19.     Defendant Robert J. Bernhard ("Bernhard") has served as a Cummins director since 2008.  Bernhard is a member of the Board's Audit Committee, Governance Committee and Safety Environment and Technology ("SET") Committees.  Upon information and belief, Bernard is a citizen of Indiana.

20.     Defendant Bruno V. DiLeo ("DiLeo") has served as a Cummins director since 2015.  DiLeo is a member of the Board's Finance Committee, Governance Committee and SET Committee.  Upon information and belief, DiLeo is a citizen of California.

21.     Defendant Steven B. Dobbs ("Dobbs") has served as a Cummins director since 2010.  Dobbs is a member of the Board's Audit Committee and Governance Committee and chairs the SET Committee.  Upon information and belief, Dobbs is a citizen of Texas.

22.     Defendant Carla A. Harris ("Harris") has served as a Cummins director since 2021. Harris is a member of the Board's Talent and Compensation Committee ("TCC"), Finance

Committee and Governance Committee.  Upon information and belief, Harris is a citizen of New York.

23.     Defendant Thomas J. Lynch ("Lynch") has served as a Cummins director since 2015.  Lynch is a member of the Board's TCC and chairs the Finance Committee and Governance Committee.  Upon information and belief, Lynch is a citizen of Pennsylvania.

24.     Defendant William I. Miller ("Miller") has served as a Cummins director since 1989.  Miller is a member of the Board's Audit Committee, TCC and Governance Committee. Upon information and belief, Miller is a citizen of New York.

25.     Defendant Georgia R. Nelson ("G. Nelson") has served as a Cummins director since 2004.  G. Nelson is a member of the Board's Audit Committee and Governance Committee and chairs the TCC.  Upon information and belief, G. Nelson is a citizen of Colorado.

26.     Defendant Kimberly A. Nelson ("K. Nelson") has served as a Cummins director since 2020.  K. Nelson is a member of the Board's Audit Committee, Governance Committee and SET Committee.  Upon information and belief, K. Nelson is a citizen of Minnesota.

27.     Defendant Norman T. Linebarger ("Linebarger") served as the Company's CEO and Chairman from 2012 until his retirement in August 2022.  Upon information and belief Linebarger is a citizen of Indiana.

28.     Defendant Alexi M. Herman ("Herman") served as a director of the Company from 2001 through 2022.  During her tenure, Herman served on the Company's Audit, Compensation, and Governance and Nominating Committees.  Upon information and belief Herman is a citizen of Virginia.

29.     Defendant Karen H. Quintos ("Quintos") has served as a Cummins director since 2017.  Quintos is a member of the Board's Audit Committee, Governance Committee and SET Committee.  Upon information and belief, Quintos is a citizen of Texas.

30.     Collectively, Rumsey, Belske, Bernhard, DiLeo, Dobbs, Fisher, Harris, Lynch, Miller, G. Nelson, K. Nelson, Linebarger, Herman and Quintos are referred to herein as the "Defendants."

31.     Collectively, Belske, Bernhard, Dobbs, Miller, G. Nelson, K. Nelson and Quintos are referred to herein as the "Audit Committee Defendants."

32.     Collectively, Dobbs, Bernhard, Di Leo, Herdman, K. Nelson and Quintos are referred to herein as the "SET Committee Defendants."

33.     Collectively, Di Leo, Harris and Lynch are referred to herein as the "Finance Committee Defendants."

**THE DEFENDANTS' DUTIES**

34.     By reason of their positions as officers, directors, and/or fiduciaries of Cummins, and because of their ability to control the business and corporate affairs of Cummins, Defendants owed Cummins and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Cummins in a fair, just, honest and equitable manner.

35.     Further, Defendants were and are required to act in furtherance of the best interests of Cummins and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest and benefit.  Each director and officer of the Company owes to Cummins and its shareholders the fiduciary duty to exercise good faith and due diligence in the

administration of the Company's affairs, and in the use and preservation of its property and assets, as well as the highest obligation of fair dealing.

36.     Because of their positions of control and authority as directors and/or officers of Cummins, having knowledge of material non-public information regarding the Company, the Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.   To discharge their duties, the officers and directors of Cummins were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.   By virtue of such duties the officers and directors of Cummins were required to, among other things:

> a.     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

> b.     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner, and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public; and

> c.     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

37.     The Audit Committee Defendants, Belske, Bernhard, Dobbs, Miller, G. Nelson, K. Nelson and Quintos, additionally are subject to the responsibilities imposed on them by the Company's Audit Committee Charter which states, in pertinent part:

> I.     Purpose

> The purpose of the Committee is to:

A.      assist the Board of Directors in its oversight of:

•the ***integrity of the Company's financial statements, and related financial disclosures and internal control*** over financial reporting, including information technology security and control;

•the Company's compliance with its ethics policies, and legal and ***regulatory requirements***; and

•the independent auditor's qualifications and independence.

B.      prepare the report of the Committee required to be included in the proxy statement;

C.      select, retain, compensate, oversee and evaluate the independent auditor;

D.      provide assistance to the Board of Directors in its oversight of Company guidelines and policies with respect to business risk management and other matters as the Board or the Committee deems appropriate; and

E.      oversee the performance of the Company's internal audit function and periodically receive confirmation of its compliance with the Institute of Internal Auditors' International Standards for the Professional Practice of Internal Auditing through Quality Assessment Reviews.

                        *       *       *

B.      Oversight of Financial Disclosure and Internal Controls

1.      The Committee will review and discuss with management, the chief audit executive and the independent auditor, as appropriate:

        (a)      the Company's annual audited financial statements and quarterly unaudited financial statements, as well as management's discussion and analysis of financial condition and results of operations, the results of each quarterly review and annual audit by the independent auditor, and other matters required to be discussed with the independent auditor by applicable laws, regulations and auditing standards, including the quality, not just the acceptability, of the accounting principles and underlying estimates used in the audited financial statements.  The Committee also will

*review and discuss each Form 10-Q and Form 10-K with the Chief Executive Officer, the Chief Financial Officer and the General Counsel, prior to filing.  The Committee will report to the Board and shareholders whether it recommends to the Board that the most recent year's audited financial statements be included in the Form 10-K*;

(b)    ***any other SEC filings*** as the Committee deems appropriate, prior to filing;

(c)    earnings press releases (including the use of pro forma or adjusted non-GAAP information) prior to release;

(d)    financial information and earnings guidance provided to analysts and rating agencies (this discussion may be general, and need not take place prior to each instance in which such information is provided);

(e)    the integrity of the Company's accounting and financial reporting processes (both internal and external), including, but not limited to…

(bb)    ***internal controls*** over financial reporting;

(viii) any disclosures made to the Committee by the Company's Chief Executive Officer and/or Chief Financial Officer regarding:

(aa) ***significant deficiencies in the design or operation of internal controls*** or any material weaknesses therein;

(bb) ***any fraud, whether or not material, involving management or other employees who have a significant role in the Company's internal controls***; and

(cc) ***any material violation of (1) any law, rule or regulation*** (including securities laws) applicable to the Company or the operation of its businesses or (2) the Company's Code of Conduct; and

(ix) any special audit steps adopted in light of material control deficiencies.

(f)     Internal audit charter, internal audit results, internal audit plans, and any significant changes to internal audit plans

***

(b)     ***Any reports or inquiries received from regulators, governmental agencies, employees or others*** that raise material issues regarding the Company's financial statements, internal control over financial reporting and accounting or compliance policies;

(c)     the management delegation of authority process; and

(d)     such other matters as the Board or the Committee considers appropriate.

8.      The Committee shall oversee the Company's guidelines and policies concerning Risk Assessment and Enterprise Risk Management (ERM).   At least Annually, the Committee shall review an ERM Report displaying a comprehensive and prioritized list of risks. The Committee shall designate risk areas for discussion and periodically review the status of topics for which it has oversight responsibility.

9.      The Committee members will participate in periodic educational sessions on accounting and financial reporting matters.

38.     The SET Committee Defendants, Dobbs, Bernhard, Di Leo, Herdman, K. Nelson and Quintos, are, according to the Company, the "***highest level of accountability for Cummins' climate-related risks***."   *See* ¶ 68.   Indeed, the SET Committee responsible for overseeing, among other things:

- [Cummins's] safety program with an emphasis on employee, workplace and product safety.
- [Cummins's] progress on its ***major sustainability initiatives from Planet 2050[2] and the environmental management*** of our facilities and operations.

---

[2] "Planet 2050" is Cummins's highly touted environmental sustainability plan under which the Company pledges to reduce its products' harmful emissions up to 50%, reducing such emissions by tens of millions of metric tons.  For example, according to its website: "Cummins' next generation environmental sustainability strategy looks out to 2050, setting quantifiable goals for 2030 along with visionary longer-term aspirations to 2050. The audacious and exciting

- [Cummins's] **Destination Zero[3] initiative** and key technology developments that may impact product competitiveness for both core and new business areas.
- [*P]ublic policy developments, strategies and positions taken by us with respect to safety, environmental* and technological matters that significantly impact us or our products.
- [Cummins's] product and service quality performance and guid[ing] our strategies and *improvement initiatives*.

Cummins Proxy Statement filed March 27, 2023 with the SEC on Schedule 14A ("3/27/23 Proxy") at 13.

39.     The Finance Committee Defendants, Di Leo, Harris and Lynch, are responsible for overseeing, among other things:

- [Cummins's] *financial strategy* pertaining to our capital structure, creditworthiness, dividend policy, share repurchase policy, and financing requirements.
- [Cummins's] banking relationships and lines of credit.
- [Cummins's] financing proposals for acquisitions, partnerships and other *alliances of the company*.
- *[K]ey areas of shareholder interest* and feedback on our performance and strategy.
- [Cummins's] shareholder base and provid[ing] counsel on *investor relations activity*.

*Id*.

40.     Additionally, Cummins's Code of Conduct imposes the following requirements concerning internal controls, public disclosures and environmental commitments, among other things:

---

strategy affects Cummins and our stakeholders positively." https://www.cummins.com/company/esg/environment/planet-2050

[3] "Destination Zero" is another Cummins initiative purportedly underway along side Planet 2050 under which the Company boasts it is endeavoring to produce engines that emit no harmful emissions.  Per Cummins: "Climate change is an existential crisis. Our world will forever need power. We've made finding solutions to these twin challenges our responsibility. Destination Zero is the road we've paved to a zero emissions future where we continue to provide the power that our world needs."  https://www.cummins.com/company/esg/environment/destination-zero

Our 10 Ethical Principles

1. ***We will follow the law everywhere***.
2. We will embrace diverse perspectives and backgrounds, and treat all people with dignity and respect.
3. ***We will compete fairly and honestly***.
4. We will avoid conflicts of interest.
5. We will demand ***that everything we do leads to a cleaner, healthier and safer environment***.
6. We will protect our technology, our information and our intellectual property.
7. We will demand that our ***financial records are accurate*** and that our ***reporting processes are clear and understandable***.
8. We will strive to ***improve our communities***.
9. We will ***communicate honestly*** and with integrity.
10. We will create a culture where all employees take responsibility for ethical behavior.

41. Defendants failed miserably to uphold their duties to the Company, especially the Audit Committee members Belske, Bernhard, Dobbs, Miller, G. Nelson, K. Nelson and Quintos; SET Committee members Dobbs, Bernhard, Di Leo, Herdman, K. Nelson and Quintos; and Finance Committee members Di Leo, Harris and Lynch. As set forth below, Defendants failed to detect, prevent and/or disclose, Cummins's decades long disregard for environmental regulations and resultant historic fines and penalties, notwithstanding their fiduciary duties, generally, and the above discussed committees' respective duties concerning financial reporting; environmental safety and regulatory compliance; and financial damage caused by the Company's illegal behavior.

## SUBSTANTIVE ALLEGATIONS

### Background

42. Cummins is a U.S. based multinational company that designs, manufactures, and distributes engines, filtration and power generation products and also services engines and related equipment, such as fuel systems, controls, air handling, filtration, emission control, electrical

13

power generation systems, and trucks.  The Company sells its products in approximately 190 countries and territories through a network exceeding 600 company-owned and independent distributors and approximately 7,200 dealers.  Cummins trades on the New York Stock Exchange (Cummins).

43.    Among Cummins's largest customers is non-defendant Stellantis, N.V. ("Stellantis"), a Netherlands-based partnership that owns several automobile companies, including Ram Trucks, marketed as RAM.  The Company reported in its 2023 Annual Report filed on Form 10-K with the SEC that Stellantis is "[t]he principal customer of [Cummins's] pick-up on-highway engines," with sales to Stellantis and three other customers accounting for 36% of Cummins's consolidated net sales in 2022, despite having "thousands of customers around the world."

44.    Cummins long has touted its commitment to the environment and transparency in its activities and financial reporting.  Indeed, Cummins's publicly available *Ten Ethical Principles* include "We will demand that everything we do leads to a cleaner, healthier and safer environment" and "We will demand that our financial records are accurate and that our reporting processes are clear and understandable."  Cummins Code of Business Conduct.[4]  Unfortunately, Cummins failed to live up to these and other of its principles.

45.    Cummins's industry—diesel engine production and sales—is governed primarily by the CAA, which regulates air emissions from stationary and mobile sources on a federal level.[5] The CAA and CCAA, at core, require that vehicle and engine makers comply with emissions

---

[4] Available at: https://investor.cummins.com/board-esg/governance/governance-documents
[5] States also have their own CAA equivalent statutes.  California, for example, has the CCAA, **which CMI also violated,** as discussed herein.

standards established by the U.S. Environmental Protection Agency ("EPA"), National Highway

Traffic Safety Administration and California Air Resources Board ("CARB").

46.     Relevant to the within action, the CAA makes it illegal:

> for any person to manufacture or sell, or offer to sell, or install, any
> part or component intended for use with, or as part of, any motor
> vehicle or motor vehicle engine, where a principal effect of the part
> or component is to bypass, defeat, or render inoperative any device
> or element of design installed on or in a motor vehicle or motor
> vehicle engine in compliance with regulations under this subchapter,
> and where the person knows or should know that such part or
> component is being offered for sale or installed for such use or put
> to such use . . .

42 U.S.C. 85, §7522(a)(3)(B).

47.     Such components are referred to within the diesel engine industry as "Defeat

Devices" because they "defeat" engines' emission control systems designed to prevent harmful

hydrocarbons and other pollutants from escaping into the atmosphere.[6]

48.     As the market would learn on December 22, 2023, on Defendants' watch,

Cummins had use Defeat Devices at will on engines produced for, at least, its major client

Stellantis since at least 2013, and as a result, Cummins was to pay a "record breaking" penalty to

exceed $2 billion.

49.     This was not, by any means, Cummins's first run-in with the DOJ, EPA and/or

CARB.  In fact, it **was not even its first time paying a record breaking fine to these agencies for**

**using Defeat Devices** to mask its CAA violations and infliction of untold environmental harm in

the name of profit.

---

[6] The EPA has provided the industry, including CMI, additional guidance specifically on defeat devices since 1998.
*See EPA Enforcement Alert: Clean Air Act Prohibits 'Defeat Devices' in Vehicles, Engines,* chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.epa.gov/sites/default/files/2014-06/documents/defeat.pdf.

**Cummins's 1998-2023 Regulation Violations and Misleading Statements**

50.     Cummins has long touted its regulatory compliance and transparency.   For example, in the Company's annual report for the year ended December 31, 1997, filed with the SEC on Form 10-K on March 4, 1998, Cummins stated:

> Cummins' products comply with emissions standards that the US Environmental Protection Agency ("EPA") and California Air Resources Board ("CARB") have established for heavy-duty on-highway diesel and gas engines and off-highway engines produced through 1997.  Cummins' ability to comply with these and future emissions standards is an essential element in maintaining its leadership position in the North American regulated markets.  The Company will make significant capital and research expenditures to comply with these standards.

51.     Then, on October 22, 1998, The EPA announced that Cummins and a small group of diesel engine manufacturers were fined $83.4 million -- the largest penalty at the time -- for using Defeat Devices that resulted in "illegal amounts of air pollution."[7]

52.     In conjunction therewith, Cummins entered into a Consent Decree[8] (the "98-99 Consent Decree").  Announcing the 98-99 Consent Decree, the EPA stated:

> On October 22, 1998, the Department of Justice and the Environmental Protection Agency announced an *$83.4 million* total penalty against diesel manufacturers [seven, including Cummins], *the largest civil penalty ever for violation of environmental law.* Under this settlement, seven major manufacturers of diesel engines will spend *more than one billion dollars to resolve claims* that they installed computer devices in heavy duty diesel engines which resulted in illegal amounts of air pollution emissions. This *settlement will prevent 75 million tons of harmful nitrogen oxide ($NO_x$) emissions* nationwide by the year 2025.

---

[7]   Though reached in 1998, this consent decree was not filed until July 1999.   *See* https://www.epa.gov/enforcement/cummins-engine-company-diesel-engine-clean-air-act-settlement.
[8] *Id.*

53. To quell market concern over this major EPA action, Cummins's insiders sought to minimize the wrongful behavior by noting its purported resultant "extensive" compliance (re-)actions and, incredibly, ***blaming the EPA for not conducting surprise testing*** prior catching the Company cheating federal and state emission standards.  For example, in its Annual Report for the fiscal year ended December 31, 1998 filed with the SEC on form 10-K on March 3, 1999 ("FY 1998 10-K"), the Company stated:

> In October 1998, Cummins and other manufacturers of heavy-duty diesel engines entered into a Consent Decree with the Environmental Protection Agency, the U. S. Department of Justice and the California Air Resources Board related to concerns they had raised regarding the level of Nitrogen Oxide (NOx) emissions from diesel engines under certain driving conditions.  The terms of that Consent Decree are a matter of public record.  ***Cummins has developed extensive corporate action plans to comply with all aspects of the Consent Decree***. . .
>
> Model year 1998 marked the latest major change in emissions requirements for heavy-duty on-highway diesel engines when the oxides of nitrogen standard was lowered from 5.0 to 4.0 g/bhp-hr.
>
> Contained in the environmental regulations are several means for the EPA to ensure and verify compliance with emissions standards. Two of the principal means are tests of new engines as they come off the assembly line, referred to as selective enforcement audits ("SEA"), and tests of field engines, commonly called in-use compliance tests.  ***The SEA provisions have been used by the EPA to verify the compliance of heavy-duty engines for several years. In 1998, no such audit test was performed on Cummins engines. The failure of an SEA could result in cessation of production of the noncompliant engines and the recall of engines produced prior to the audit***.  In the product development process, Cummins anticipates SEA requirements when it sets emissions design targets . . .

FY 1998 10-K at 8 (emphasis added).

54. Contrary to this and other Company statements concerning environmental responsibility and regulatory compliance, ***Cummins continually violated the 98-99 Consent***

17

***Decree***, continuing to use defeat devices and other emission-cheating technology in the years that followed, *unfettered by any Board action*, ***resulting in over $3 million in additional penalties***.

55.     First, in September 2006 (effective November 2006), Cummins entered into the Agreement Regarding Alleged Non-Compliance with Consent Decree for violating the Consent Decree ("CD Violation 1 Agreement")[9]. The CD Violation 1 Agreement stated, in relevant part:

> Cummins: sought Certificates of Conformity for ***approximately 11,600 engines equipped with an Auxiliary Emission Control Device ("AECD") that did not operate*** as set forth in the Consent Decree, leading to ***excess emissions of approximately 979 tons of NO***, over the life of the engines if uncorrected; used 1101 more Averaging, Banking and Trading ("AB&T") Credits than the amount set forth in the Consent Decree, leading to ***more than 1000 tons of excess emissions of NO***,; implemented a Low NO, Rebuild Program for which Cummins failed to timely request the requisite EPA approval (until April 13,2006 ); and ***omitted 26,347 engines from its Low NO, Rebuild Program*** that should have been included in the Program and were not included until August 2005, ***leading to approximately 42 tons excess emissions of NOx*** over the life of the engines if uncorrected. In addition, Cummins has disclosed to the United States that in 2001 it ***violated provisions of 40 CFR Part 86 in connection with certification testing of engines*** under the Consent Decree by its failure to perform test equipment calibrations within applicable time limits set forth in 40 C.F.R. sections 86.1321; 1321(b); 1323(a) & @) and 1324. . .

56.     The EPA fined Cummins $950,000 and imposed several remedial measures for this violation.

57.     Then, in October 2006, Cummins conceded that it ***again violated*** the 98-99 Consent Decree (without Board intrusion). According to the Second Agreement Regarding Alleged Non-Compliance with Consent Decree, ("CD Violation 2 Agreement")[10]:

---

[9] Available at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.epa.gov/sites/default/files/2013-10/documents/cumminsnoticeofsettlement100606.pdf
[10] Available at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.epa.gov/sites/default/files/documents/cumminssecondagreement110606.pdf

> Cummins . . . used in its Averaging, Banking and Trading ("AB&T") program credits from 192 model year 2003 and 130 model year 2004 compressed natural gas engines that were subsidized as part of a Consent Decree Offset Project, leading to the improper generation of 243.5 megagrams (Mg) of NOx + NMHC and 13.9 Mg of PM urban bus credits (disclosed in its letter of September 7, 2006, Attachment A hereto); and failed to timely complete work on, or to timely submit an adequate completion report for, several work plans for its offset Projects approved by EPA under the Consent Decree . . .

58.   This violation cost the Company $2.1 million. *Id.*

59.   On November 8, 2010, Cummins agreed to pay $375,000 in stipulated penalties for ***violating the 98-99 Consent Decree for a third time***, this go-around for violations of In-Use Testing Program, which the 98-99 Consent Decree required the Company "to improve methods to test compliance by heavy duty diesel engines on the road (as opposed to in the laboratory) . . ."[11]

60.   The Company hid from these violations.

61.   Meanwhile, in the midst of the above-described violations, Cummins was involved in yet another, independent scheme.  Prior to Cummins's third violation of the 1999 Consent Decree, on February 22, 2010, the DOJ announced that Cummins would pay a $2.1 million penalty (again) and recall 405 engines for violating the CAA.  In that matter, between 1998—the end of the conduct covered in the Consent Decree—and 2006 alone, Cummins shipped more than 570,000 heavy duty diesel engines to manufacturers without installing CAA required pollution control equipment called exhaust after-treatment devices ("ATDs").  ATDs control engine exhaust emissions that have exited the engine and entered the exhaust system.  Similar to catalytic converter in cars, the ATDs that Cummins failed to install ***for at least eight years*** are designed to

---

[11] https://ww2.arb.ca.gov/cummins-inc-settlement

filter out harmful byproducts in exhaust gases and burn them up, thereby reduce harmful emissions into the atmosphere.[12]

62.     Commenting on the settlement, Ignacia S. Moreno, Assistant Attorney General for the DOJ's Environmental and Natural Resources Division, stated:

> This settlement assures that the environment suffers no ill effects because it requires that Cummins not only install the proper pollution control devices but also mitigate the effects of the harmful emissions released as a result of its actions. *Id.*

63.     True to form, Cummins did not publicly acknowledge, much less discuss, this new EPA matter or the $2.1 million penalty, either.

64.     Instead, between 2010 and 2019, the Company touted its compliance with environmental standards and EPA and CARB regulations.  Typical of these statements, issued quarterly, is the following from Cummins's yearly report for the fiscal year ended December 31, 2010, filed with the SEC on form 10-K on February 24, 2011 (the "FY 2010 10-K"):

> ENVIRONMENTAL COMPLIANCE
>
> *Sustainability*
>
> We continue to be a leader in sustainable business development and practices. We have invested significantly in new products and technologies designed to further lower emission and increase fuel efficiency from our products. We have increased our commitment to addressing the global impact of climate change through the structured approach of our 10 climate change principles developed last year that address ways we are becoming a greater part of the solution. We have worked collaboratively with customers to improve their fuel economy and reduce their carbon footprint. We have significantly reduced greenhouse gas (GHG) emission from our facilities through a strong energy efficiency program and we met our publicly stated goal of 25 percent intensity reduction after complete 2010 goal-year environmental data was verified. We have

---

[12]   *See*   https://www.justice.gov/opa/pr/cummins-inc-agrees-pay-21-million-penalty-diesel-engine-clean-air-act-violations

taken leadership positions on climate change by articulating our positions on key public policy issues surrounding climate change. For the sixth consecutive year, we were named to the Dow Jones World Sustainability Index, which recognizes the top 10 percent of the world's largest 2,500 companies in economic, environmental and social leadership. Our sustainability report for 2010 is available on our website at www.cummins.com.

*Product Environmental Compliance*

Our engines are subject to extensive statutory and regulatory requirements that directly or indirectly impose standards governing emission and noise. Our products comply with all current emission standards that the EPA, the California Air Resources Board (CARB) and other state and international regulatory agencies have established for heavy-duty on-highway diesel and gas engines and off-highway engines. Our ability to comply with these and future emission standards is an essential element in maintaining our leadership position in regulated markets. We have made, and will continue to make, significant capital and research expenditures to comply with these standards. Failure to comply with these standards could result in adverse effects on our future financial results.

EPA Engine Certifications

The current on-highway emission standards came into effect in the U.S. on January 1, 2010. To meet the 2010 U.S. EPA heavy-duty on-highway emission standards, we used an evolution of our proven 2007 technology solution to maintain power and torque with substantial fuel economy improvement and maintenance intervals comparable with our 2007 compliant engines. We offer a complete lineup of on-highway engines to meet the near-zero emission standards. Mid-range and heavy-duty engines for EPA 2010 require nitrogen oxide (NOx) aftertreatment. NOx reduction is achieved by an integrated technology solution comprised of the XPI High Pressure Common Rail fuel system, Selective Catalytic Reduction (SCR) technology, next-generation cooled exhaust gas recirculation (EGR), advanced electronic controls, proven air handling and the Cummins Particulate Filter. The EPA and CARB have certified that our engines meet the 2010 emission requirements. Emission standards in international markets, including Europe, Japan, Mexico, Australia, Brazil, India and China are becoming more stringent. We believe that our experience in meeting U.S. emission standards leaves us well positioned to take advantage of opportunities in these markets as the need for emission control capability grows. . .

21

FY 2010 10-K at 14.

65.     Then, on April 29, 2019, Cummins issued cryptic messages concerning "conversations" with the EPA and CARB.  Though of little substance, the Company, years later, would point to the 4/29/19 8-K as notice that Cummins was engaged in what would be myriad violations and $2 billion in penalties.[13]  The 4/29/19 8-K stated, *in full*:

> On April 29, 2019, Cummins Inc. (the "Company") issued a press release announcing that the Company is conducting a formal review of its emissions certification process and compliance with emissions standards for pickup truck applications with its regulators and other agencies, following conversations with the United States Environmental Protection Agency and the California Air Resources Board regarding certification for the Company's engines in the model year 2019 RAM 2500 and 3500 trucks.  A copy of the press release is furnished herewith as Exhibit 99 to this Current Report on Form 8-K and is incorporated herein by reference.

66.     Attached to the 4/29/19 8-K was the press release referred to therein (the "4/29/19 Press Release").  The 4/29/19 Press Release stated, *in full*:

> Cummins Reviewing Emissions Certification and Compliance Process for its Pickup Truck Applications
>
> COLUMBUS, IN. - Cummins Inc. (NYSE: Cummins) today announced that the company is formally reviewing its emissions certification and compliance process for its pickup truck applications.
>
> Following conversations with the U.S. EPA and CARB regarding certification for the engines in the 2019 RAM 2500 and 3500 trucks, the company made the decision to review its certification process and compliance with emissions standards. This review is being conducted with external advisors to ensure the certification process for Cummins pickup truck applications is consistent with its internal policies, engineering standards and applicable laws. Cummins has voluntarily disclosed the review to our regulators and other agencies and will cooperate with them to ensure a complete and thorough review and implement recommendations for improvement.

---

[13] *See* CMI's Quarterly Report for the period ended March 31, 2023 filed with the SEC on Form 10-Q (the "3/31/23 10-Q"). at 18-19.

> Cummins strives to be a leader in developing and implementing technologies that provide customers with the highest performing products that also have the least impact on the environment, and it has a long history of working with governments and regulators to achieve these goals. Cummins remains committed to ensuring that its products meet all current and future emissions standards and delivering value to our customers.

67.     On July 30, 2019, Cummins filed with the SEC its quarterly report for the period ended June 30, 2019 on Form 10-Q (the "2Q 2019 10-Q"). Regarding the EPA and CARB's ongoing investigation, the 2Q 2019 10-Q contained only the following vague, soft language— terms like "conversations" and "concerns"—purportedly to describe the monumental EPA/CARB action:

> On April 29, 2019, we announced that we were conducting a formal internal review of our emissions certification process and compliance with emissions standards for our pick-up truck applications, following conversations with the U.S. Environmental Protection Agency (EPA) and California Air Resources Board (CARB) regarding certification of our engines in model year 2019 RAM 2500 and 3500 trucks. This review is being conducted with external advisors to ensure the certification and compliance processes for all of our pick-up truck applications are consistent with our internal policies, engineering standards and applicable laws. In addition, we announced that we voluntarily disclosed our formal internal review to our regulators and other agencies and were working cooperatively to ensure a complete and thorough review. During conversations with the EPA and CARB about the effectiveness of our pick-up truck applications, the agencies raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and did not fully comply with their requirements for certification. As a result, our internal review focuses, in part, on the agencies' concerns. We are working closely with the agencies to enhance our emission systems to improve the effectiveness of all of our pick-up truck applications and to fully address the agencies' requirements. Due to the preliminary nature of our formal review, our collaboration with our regulators to address their questions and concerns and the presence of many unknown facts and circumstances, we cannot predict the

> outcome of this review and process, and we cannot provide
> assurance that the matter will not have a materially adverse impact
> on our results of operations and cash flows.

2Q 2019 10-Q at 54.

68.     Still, Cummins continued to boast of its past, present and future compliance with

environmental regulations.  For example, On February 11, 2020, the Company filed with the SEC

its annual report for the year ended December 31, 2019 on Form 10-K (FY 2019 10-K).  In the FY

2019 10-K, Cummins reported on its purported pro-environmental efforts such as "PLANET

2050," noting that the Board's SET Committee—i.e. Defendants Dobbs, Bernhard, Di Leo,

Herdman, K. Nelson and Quintos—represents the "highest level of accountability for Cummins'

climate-related risks." Specifically:

> ***We adopted our comprehensive environmental sustainability plan
> in 2014 after examining our entire environmental footprint,
> focusing on the key areas of water, waste, energy and greenhouse
> gases (GHG)***. As the concept and scope of environmental
> sustainability has matured and broadened, leaders have moved from
> initially working on environmental impacts within our direct control
> in our operations to an expanded view of fuel and raw materials that
> reaches across the entire product life-cycle from design to
> manufacture to end of life. Our environmental sustainability plan is
> the way we carry out our priorities, goals and initiatives in our action
> areas, including ***reducing our carbon footprint***, using fewer natural
> resources and partnering to solve complex problems.
>
> ***The highest level of accountability for Cummins' climate-related
> risks and opportunities is with the SET (SET) committee of the
> Board of Directors (the Board).*** The Action Committee for
> Environmental Sustainability meets monthly and reports to the
> Chairman and to the SET committee at least annually.
>
> \*\*\*
>
> ***We continue to articulate our positions on key public policy issues
> and on a wide range of environmental issues. We are actively
> engaged with regulatory, industry and other stakeholder groups
> around the world*** as GHG and fuel efficiency standards become

more prevalent globally. We were named number 17 in Newsweek's 2019 Green Ranking of U.S. companies, number 14 among Barron's Top 100 Most Sustainable Companies as well as named to the Dow Jones North American Sustainability Index for the fourteenth consecutive year in 2019.

*In late 2019, Cummins introduced PLANET 2050, a sustainability strategy focused on three priority areas: addressing climate change and air emissions*, using natural resources in the most sustainable way and improving communities. It includes eight specific goals to achieve by 2030, as well as aspirational targets for 2050. Cummins is currently evaluating how the new goals will be integrated into business planning and will report on progress beginning in 2022.

69.     The FY 2019 10-K further stated:

*We strive to be a leader in developing and implementing technologies that provide customers with the highest performing products that also have the least impact on the environment and have a long history of working with governments and regulators to achieve these goals*. We remain committed to ensuring that our products meet all current and future emission standards and delivering value to our customers.

On October 17, 2019, the Board approved the creation of a new Product Compliance and Regulatory Affairs Organization to lead engine emission certification and compliance and regulatory affairs. This new organization is led by the Vice President - Product Compliance and Regulatory Affairs who *reports directly to the Chief Executive Officer*, and the new Vice President joins the Cummins Executive Team and Cummins Leadership Team. The focus of this new organization will be to strengthen our ability to design great products that help our customers win while ensuring compliance with increasingly challenging global emission regulations. *The organization will also work to enhance our collaboration with the agencies that set the direction and regulations of emissions to best ensure we are meeting every expectation today while planning ahead for future changes*.

70.     On November 2, 2021, the Company issued its quarterly report for the period ended September 29, 2021, filed with the SEC on Form 10-Q (the "Q3 2021 10-Q"). In it, as it had done periodically before, restated the above, adding—again vaguely and softly—that

"During our discussions, the regulators turned their attention to other model years and other engines, most notably our pick-up truck applications for RAM 2500 and 3500 trucks for model years 2013 through 2018."

71.    On May 3, 2022, Cummins issued its quarterly report for the period ended March 31, 2022, filed with the SEC on Form 10-Q (the "Q1 2022 10-Q").  The Q1 2022 10-Q again parroted the above, adding only a single line stating that a recall was forthcoming.  Specifically:

> On April 29, 2019, we announced that we were conducting a formal internal review of our emissions certification process and compliance with emission standards for our pick-up truck applications, following conversations with the EPA and CARB regarding certification of our engines in model year 2019 RAM 2500 and 3500 trucks. This review is being conducted with external advisors as we strive to ensure the certification and compliance processes for all of our pick-up truck applications are consistent with our internal policies, engineering standards and applicable laws. During conversations with the EPA and CARB about the effectiveness of our pick-up truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices. As a result, our internal review focuses, in part, on the regulators' concerns. We are working closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements. Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019. During our ongoing discussions, the regulators turned their attention to other model years and other engines, most notably our pick-up truck applications for RAM 2500 and 3500 trucks for model years 2013 through 2018. In connection with these and other ongoing discussions with the EPA and CARB, we are developing a new software calibration and will recall model years 2013 through 2018 RAM 2500 and 3500 trucks. We accrued $30 million for the recall during the first quarter of 2022, an amount that reflects our current estimate of the cost of the recall.
>
> We will continue to work together closely with the relevant regulators to develop and implement recommendations for

> improvement and seek to reach further resolutions as part of our
> ongoing commitment to compliance. Due to the presence of many
> unknown facts and circumstances, we are not yet able to estimate
> any further financial impact of these matters. It is possible that the
> consequences of any remediation plans resulting from our formal
> review and these regulatory processes could have a material adverse
> impact on our results of operations and cash flows.

Q1 2022 10-Q at 19.

72.     On November 4, 2022, the Company issued its quarterly report for the period

ended September 30, 2022, filed with the SEC on Form 10-Q (the "Q3 2022 10-Q").  Once again,

on Defendants' watch, Cummins repeated previous language, but included one line concerning a

expanding the previously mentioned recall to include an additional truck model.  Specifically:

> April 29, 2019, we announced that we were conducting a formal
> internal review of our emissions certification process and
> compliance with emission standards for our pick-up truck
> applications, following conversations with the EPA and CARB
> regarding certification of our engines in model year 2019 RAM
> 2500 and 3500 trucks. This review is being conducted with external
> advisors as we strive to ensure the certification and compliance
> processes for all of our pick-up truck applications are consistent with
> our internal policies, engineering standards and applicable laws.
> During conversations with the EPA and CARB about the
> effectiveness of our pick-up truck applications, the regulators raised
> concerns that certain aspects of our emissions systems may reduce
> the effectiveness of our emissions control systems and thereby act
> as defeat devices. As a result, our internal review focuses, in part,
> on the regulators' concerns. We are working closely with the
> regulators to enhance our emissions systems to improve the
> effectiveness of all of our pick-up truck applications and to fully
> address the regulators' requirements. Based on discussions with the
> regulators, we have developed a new calibration for the engines in
> model year 2019 RAM 2500 and 3500 trucks that has been included
> in all engines shipped since September 2019. During our ongoing
> discussions, the regulators turned their attention to other model
> years and other engines, most notably our pick-up truck applications
> for RAM 2500 and 3500 trucks for model years 2013 through 2018
> and Titan trucks for model years 2016 through 2019. In connection
> with these and other ongoing discussions with the EPA and CARB,
> we are developing a new software calibration and will recall model

27

years 2013 through 2018 RAM 2500 and 3500 trucks. We accrued $30 million for the RAM recall during the first quarter of 2022, an amount that reflected our current estimate of the cost of that recall. We are also developing a new software calibration and hardware fix and will recall model years 2016 through 2019 Titan trucks. We accrued $29 million for the Titan recall during the third quarter of 2022, an amount that reflected our current estimate of the cost of that recall.

We will continue to work together closely with the relevant regulators to develop and implement recommendations for improvement and seek to reach further resolutions as part of our ongoing commitment to compliance. Due to the presence of many unknown facts and circumstances, we are not yet able to estimate any further financial impact of these matters. It is possible that the consequences resulting from our formal review and these regulatory processes could have a material adverse impact on our results of operations and cash flows.

Q3 2022 10-Q at 21.

73.     By November 23, 2023, the Company's disclosures concerning the EPA and CARB's investigation had grown slightly in sum, but not substance.  For example, the Company's quarterly report for the period ended September 30, 2023, filed on with the SEC on form 10-Q on November 2, 2023, repeated the language Cummins used to that point in 2023, as follows:

On April 29, 2019, we announced that we were conducting a formal internal review of our emissions certification process and compliance with emission standards for our pick-up truck applications, following conversations with the Environmental Protection Agency (EPA) and California Air Resources Board (CARB) regarding certification of our engines in model year 2019 RAM 2500 and 3500 trucks. This review is being conducted with external advisors as we strive to ensure the certification and compliance processes for all of our pick-up truck applications are consistent with our internal policies, engineering standards and applicable laws. During conversations with the EPA and CARB about the effectiveness of our pick-up truck applications, the regulators raised concerns that certain aspects of our emissions systems may reduce the effectiveness of our emissions control systems and thereby act as defeat devices. As a result, our internal review focuses, in part, on the regulators' concerns. We are working

28

closely with the regulators to enhance our emissions systems to improve the effectiveness of all of our pick-up truck applications and to fully address the regulators' requirements. Based on discussions with the regulators, we have developed a new calibration for the engines in model year 2019 RAM 2500 and 3500 trucks that has been included in all engines shipped since September 2019. During our ongoing discussions, the regulators turned their attention to other model years and other engines, most notably our pick-up truck applications for RAM 2500 and 3500 trucks for model years 2013 through 2018 and Titan trucks for model years 2016 through 2019. Most recently, the regulators have also raised concerns regarding the completeness of our disclosures in our certification applications for RAM 2500 and 3500 trucks for model years 2013 through 2023. We have also been in communication with Environmental and Climate Change Canada regarding similar issues relating to some of these very same platforms. In connection with these and other ongoing discussions with the EPA and CARB, we are developing a new software calibration and will recall model years 2013 through 2018 RAM 2500 and 3500 trucks. We accrued $30 million for the RAM recall during the first quarter of 2022, an amount that reflected our current estimate of the cost of that recall. We are also developing a new software calibration and hardware fix and will recall model years 2016 through 2019 Titan trucks. We accrued $29 million for the Titan recall during the third quarter of 2022, an amount that reflected our current estimate of the cost of that recall.

We will continue to work together closely with the relevant regulators to develop and implement recommendations for improvements and seek to reach further resolutions as part of our ongoing commitment to compliance. Based upon our discussions to date with the regulators which are continuing, such resolutions may involve our agreeing to one or more consent decrees and paying civil penalties. Due to the presence of many unknown facts and circumstances, we are not yet able to estimate any further financial impact of these matters. The consequences resulting from our formal review and these regulatory processes likely will have a material adverse impact on our results of operations and cash flows, however we cannot yet reasonably estimate a loss or range of loss.

**The Truth Finally Emerges**

74.     On December 22, 2023, Cummins announced that it had reached an agreement with the DOJ, EPA and CARB, "to Settle Regulatory Proceedings Regarding Its Emissions

29

Certification and Compliance Process for Pick-Up Truck Applications" and that the Company "already recalled model year 2019 RAM 2500 and 3500 trucks and has initiated a recall of model years 2013 through 2018 RAM 2500 and 3500 trucks and previously accrued a total of $59 million for the estimated costs for executing these and other related recalls."  Cummins additionally announced that it "expects to record a charge of approximately $2.04 billion in the fourth quarter of 2023 to resolve these and other related matters involving approximately one million pick-up truck applications in the United States. . ."  *Id*.  In short, the market learned that Cummins had been using defeat devices on engines produced for its major client Stellantis and other such companies with impunity since at least 2013.

75.    On December 22, 2023, Cummins filed the 12/22/23 8-K, stating:

Cummins Reaches Agreement in Principle to Settle Regulatory Proceedings Regarding Its Emissions Certification and Compliance Process for Pick-Up Truck Applications

COLUMBUS, Indiana – December 22, 2023 – Cummins Inc. (NYSE: Cummins) has ***reached an agreement in principle to resolve U.S. regulatory claims regarding its emissions certification and compliance process for certain engines primarily used in pick-up truck applications***. The company has cooperated fully with the relevant regulators, already addressed many of the issues involved, and looks forward to obtaining certainty as it concludes this lengthy matter. Cummins conducted an extensive internal review and worked collaboratively with the regulators for more than four years. The company has seen no evidence that anyone acted in bad faith and does not admit wrongdoing.

The governmental entities involved are the U.S. Environmental Protection Agency (EPA), the California Air Resources Board (CARB), the Environment and Natural Resources Division of the Department of Justice (DOJ), and the California Attorney General's Office.

Cummins disclosed a review of these matters when it began in 2019 and has regularly updated its disclosures as that review progressed. The company has ***already recalled model year 2019 RAM 2500 and***

*3500 trucks and has initiated a recall of model years 2013 through 2018 RAM 2500 and 3500 trucks and previously accrued a total of $59 million for the estimated costs* for executing these and other related recalls.

*Cummins expects to record a charge of approximately $2.04 billion in the fourth quarter of 2023 to resolve these and other related matters involving approximately one million pick-up truck applications in the United States.* Of this amount, approximately $1.93 billion relates to payments that are expected to be made in the first half of 2024. The balance reflects our best estimate of related expenses that will impact cash flow in future periods. The company is in a strong financial position with existing liquidity and access to capital to satisfy obligations associated with the settlements, support ongoing operations, and execute its growth strategy.

The settlements are subject to final regulatory and judicial approvals.

76.    Also on December 22, 2023, the DOJ issued the following press release:

Attorney General Merrick Garland Statement on the Agreement in Principle with Cummins to Settle Alleged Installation of Illegal Defeat Devices in Engines

Friday, December 22, 2023
For Immediate Release
Office of Public Affairs

$1.675 Billion Penalty Would Be Largest Ever for a Clean Air Act Violation and the Second Largest Ever Environmental Penalty

Engine manufacturer *Cummins Inc. today disclosed that it has reached an agreement in principle with the United States and State of California to pay a $1.675 billion penalty to settle claims that it violated the Clean Air Act by installing emissions defeat devices on hundreds of thousands of engines*. The Clean Air Act requires vehicle and engine manufacturers to ensure that their products comply with applicable emission limits. Defeat devices are parts or software that bypass, defeat, or render inoperative emissions controls such as emission sensors and onboard computers. *The company allegedly installed defeat devices on 630,000 model year 2013 to 2019 RAM 2500 and 3500 pickup truck engines. The company also allegedly installed undisclosed auxiliary emission*

31

*control devices on 330,000 model year 2019 to 2023 RAM 2500 and 3500 pickup truck engines*.

The Justice Department issued the following statement from Attorney General Merrick B. Garland:

"The Justice Department is committed to vigorously enforcing the environmental laws that protect the American people from harmful pollutants.

"Today, the Justice Department reached an initial agreement with Cummins Inc. to settle claims that, *over the past decade, the company unlawfully altered hundreds of thousands of engines to bypass emissions tests in violation of the Clean Air Act. As part of the agreement, the Justice Department will require Cummins to pay $1.675 billion, the largest civil penalty we have ever secured under the Clean Air Act, and the second largest environmental penalty ever secured*.

"*The types of devices we allege that Cummins installed in its engines to cheat federal environmental laws have a significant and harmful impact on people's health and safety*. For example, in this case, our preliminary estimates suggest that defeat devices on some *Cummins engines have caused them to produce thousands of tons of excess emissions of nitrogen oxides*. The cascading effect of those pollutants can, over long-term exposure, lead to breathing issues like asthma and respiratory infections.

"The Justice Department will work diligently to incorporate today's agreement into a consent decree that will be filed with the U.S. District Court for the District of Columbia.

"I am grateful to the dedicated women and men of the Environment and Natural Resources Division, as well as to our partners from the EPA, and the State of California, for their assistance in investigating and prosecuting this case and in reaching this important agreement. "*Violations of our environmental laws have a tangible impact – they inflict real harm on people in communities across the country*. This historic agreement should make clear that the Justice Department will be aggressive in its efforts to *hold accountable those who seek to profit at the expense of people's health and safety*."

77.     Commenting on the settlement, U.S. Attorney General Merrick Garland stated **"[The types of devices we allege that Cummins installed in its engines to cheat federal environmental laws have a significant and harmful impact on people's health and safety"** and that "Cummins engines have caused them to produce thousands of tons of excess emissions of nitrogen oxides . . ."  General Garland further commented that "[v]iolations of our environmental laws have a tangible impact – they inflict real harm on people in communities across the country. This **historic agreement** should make clear that the Justice Department will be aggressive in its efforts to hold accountable those who seek to profit at the expense of people's health and safety."

78.     Reacting to this news, Cummins's stock price fell $7.01 per share—over 3%—to close at $236.99 on December 22, 2023.

79.     Defendants' foregoing wrongful acts and omissions, and the subsequent declines in the market value of Cummins securities, have caused significant losses and damages.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

80.     Plaintiff brings this action derivatively in the right and for the benefit of Cummins to redress Defendants' breaches of fiduciary duty and other violations of law.

81.     Plaintiff will adequately and fairly represent the interests of Cummins and its shareholders in enforcing and prosecuting its rights.

82.     The Board currently consists of the following twelve directors: Rumsey, Belske, Bernhard, DiLeo, Dobbs, Fisher, Harris, Lynch, Miller, G. Nelson, K. Nelson and Quintos. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the following reasons:

- During the Relevant Period, Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants, Belske, Bernhard, Dobbs, Miller, G. Nelson, K. Nelson and Quintos, were and are responsible for, *inter alia*, reviewing the Company's annual

33

and quarterly financial reports and reviewing the integrity of the Company's internal controls.  the Audit Committee Defendants breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures and caused the above-discussed internal control failures. Therefore, the Audit Committee Defendants each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile;

- Moreover, the Audit Committee Defendants failed to maintain the level of oversight required, including that the requirements that the Audit Committee discuss with management and review with the Board, the legal and regulatory requirements applicable to the Company and its subsidiaries and the Company's compliance with such requirements and as appropriate, make recommendations to the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations.

- The SET Committee Defendants, Dobbs, Bernhard, Di Leo, Herdman, K. Nelson and Quintos, are according to the Company, the "highest level of accountability for Cummins' climate-related risks."  ⁋ 68.  Indeed, the SET Committee responsible for overseeing, among other things, the Company's progress on its major sustainability initiatives including Planet 2050 and Destination Zero; and   public policy developments, strategies and positions concerning environmental matters.  *See* ⁋ 37.

- The Finance Committee Defendants, Di Leo, Harris and Lynch, are responsible for overseeing, among other things, Adobe's: financing, Company alliances, "key areas of shareholder interest . . ." and the Company's "shareholder base and provid[ing] counsel on investor relations activity." *See* ⁋ 38.

- The principal professional occupation of Defendant Rumsey is his employment with Cummins as its CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.

## COUNT I

### Against All Defendants for Breach of Fiduciary Duties

83.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

84.     As alleged in detail herein, each of the Defendants violated and breached their fiduciary duties of loyalty and good faith by causing or allowing the Company to disseminate to Cummins shareholders materially misleading and inaccurate information through, *inter alia*, SEC

filings, press releases, conference calls and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

85.     Defendants, most notably those serving on the Board's Audit Committee, willfully ignored the known and pervasive problems with Cummins's internal controls and practices and procedures and failed to make a good faith effort to correct these problems or prevent their recurrence.

86.     As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages.  Thus, as a result of the misconduct alleged herein, Defendants are liable to the Company.

## COUNT II

### Against All Defendants for Unjust Enrichment

87.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

88.     By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Cummins.

89.     Plaintiff, as a shareholder and representative of Cummins, seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Declaring that Plaintiff may maintain this derivative action on behalf of Cummins and that Plaintiff is a proper and adequate representative of the Company;

B.      Against Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

C.      Directing Cummins to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable law and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

D.      Awarding to Cummins restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: January 19, 2024                              Respectfully submitted,


                                                     **COHEN & MALAD, LLP**


                              **BY:** _/s/ Scott D. Gilchrist_
                                       Scott D. Gilchrist, Atty No. 16720-53
                                       One Indiana Square, Suite 1400
                                       Indianapolis, IN 46204
                                       Telephone: (317) 636-6481
                                       Fax: (317) 636-2593
                                       sgilchrist@cohenandmalad.com

                                       **THE WEISER LAW FIRM, P.C.**
                                       James M. Ficaro
                                       John J. Gross
                                       Four Tower Bridge 200
                                       Barr Harbor Drive, Suite 400
                                       West Conshohocken, PA 19428
                                       Telephone: (610) 225-2677
                                       Facsimile: (610) 408-8062
                                       jficaro@weiserlawfirm.com
                                       jgross@weiserlawfirm.com

                                       _**Counsel for Plaintiff**_
                                       _**Vladimir Gusinsky Revocable Trust**_